**Affirmed and Memorandum Opinion filed July 12, 2012.**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-11-00292-CR

_____

**DUNG QUOC NGUYEN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 178th District Court
Harris County, Texas
Trial Court Cause No. 1226450**

## MEMORANDUM OPINION

In this murder case, appellant Dung Quoc Nguyen raises three issues, each relating to his claim that he received ineffective assistance of counsel. We overrule appellant's issues and affirm the judgment of the trial court.

# BACKGROUND

## A.    The Offense

In July 2009, appellant killed his friend and coworker, Ngan Dang, a man otherwise known as Phi. On the night of the offense, appellant and Phi were drinking with mutual friends at a karaoke bar in southwest Houston. At one point during the evening, appellant asked Phi for money, and Phi refused his request. As the bar was about to close, appellant took Phi outside and stabbed him two times in the chest. According to one witness, Phi did nothing to defend himself against the attack. Phi fell to the ground and eventually succumbed to the loss of blood. Appellant fled the scene. No weapons were ever recovered.

A few hours after the stabbing, appellant went to a Vietnamese restaurant a short distance away from the karaoke bar. The restaurant was closed, but two waitresses were still inside cleaning. When appellant knocked on the window, the waitresses recognized him as a regular customer and unlocked the door. Appellant asked for twenty dollars to buy gas, which they gave him. Appellant also told the waitresses that he had just stabbed Phi, whom they also knew. The waitresses thought that appellant was joking because he seemed so normal.

Appellant evaded arrest until October 2009, when he was finally detained in Phoenix, Arizona. Detectives with the Phoenix Police Department interrogated him before his return to Houston. Early in their interrogation, it was discovered that appellant spoke both English and Vietnamese. Appellant initially requested that his statement be given in English, but because his interviewing detective suspected that appellant was not fully understanding her questions, the interrogation was suspended until an interpreter could arrive. With the interpreter, the detective advised appellant to ensure that he understood each question before he answered. Appellant often reverted to English, however, using the interpreter only to help him along. Sometimes, appellant answered in English before the interpreter could finish translating.

2

By the end of the interrogation, appellant had confessed to Phi's stabbing. He said that when they were at the bar, the two of them went into a restroom alone, where Phi chastised appellant for asking about money in public. When they returned to the bar, appellant stated that Phi made fun of him and encouraged their friends to do the same. Appellant was upset because he had recently broken up with his girlfriend, and he felt that Phi should have realized what kind of stress he was under. Appellant said that he stabbed Phi outside because he was angry and because he had drunk too much. After describing the stabbing, appellant disclosed that he had also witnessed Phi with a gun earlier that evening when they both were in the restroom.

**B.     The Trial**

Appellant took the stand in his own defense. As an introductory matter, he stated that he was born in Vietnam, and that he came to this country in 1992 when he was only seventeen or eighteen years old. Appellant testified that he could speak English, but he said that his English was not very good and not very clear. He also indicated that he had spoken with his trial counsel both in English and through an interpreter. At trial, he testified through the use of an interpreter.

Turning to the night of the offense, appellant testified that Phi cursed at him in front of their friends just after he asked Phi for money. When appellant went to the restroom later that night, he claimed that Phi was inside using cocaine. Appellant also claimed that Phi flashed a handgun that was tucked on the inside of his front waistband. Appellant had never seen Phi with a weapon before, so he left the restroom, went to his car, and grabbed a knife. Rather than go home, appellant returned to the bar, sat down, and continued drinking.

According to appellant, Phi began telling his friends that appellant had been crying like a baby. Angered, appellant asked Phi to step outside so that they could talk privately. Once outside the bar, appellant wanted to know why Phi was humiliating him. Phi responded in an aggressive tone, "[Expletive], what do you want?" Then both men stepped

3

towards each other. According to appellant, Phi reached for something behind his back. Afraid that Phi was moving for his gun, appellant grabbed his knife and stabbed Phi in the chest. Appellant explained that he did not run away because he was convinced that he would have been shot. He also claimed that he intended only to injure Phi, not kill him.

Appellant testified that he fled the scene because he was afraid of what Phi's friends might do to him. He admitted to being very intoxicated at the time. Appellant also testified that he left Houston because he was very sad about what had happened to Phi. He wanted to reunite with friends in Philadelphia, but he purchased the wrong ticket and settled in Phoenix instead.

The jury rejected appellant's claim of self defense and convicted him of one count of first degree murder. During the punishment stage of trial, the State introduced copies of appellant's two prior convictions. The evidence showed that in 1999, appellant had been convicted of aggravated assault with a deadly weapon, and in 2007, he had been convicted of possession of a controlled substance. Appellant did not testify or present any witnesses during this stage of the proceedings. Defense counsel rested, having only reoffered the evidence that had been introduced during the guilt-innocence phase of trial. The jury assessed punishment at forty-two years' imprisonment.

## C.    The Motion for New Trial

Appellant filed a motion for new trial alleging ineffective assistance of counsel. In his motion, appellant complained that counsel was ineffective because he did not adequately communicate with appellant in Vietnamese. Appellant also complained that the failure to obtain an investigator fluent in Vietnamese prevented counsel's preparation for the case. Finally, appellant complained that counsel was ineffective because counsel failed to contact, interview, and subpoena witnesses to testify on appellant's behalf.

The trial court conducted an evidentiary hearing to consider appellant's allegations. The following paragraphs detail the witnesses and their testimony at that hearing.

4

## 1.  Defense Counsel

When counsel first met with appellant in November 2009, their initial conversation was conducted in English. Although appellant "spoke quite a bit of English," counsel realized that he "didn't understand English a hundred percent," so counsel filed a motion seeking the appointment of an interpreter. The trial court granted the motion, and according to counsel, an interpreter was requested "every time we came to court."

Counsel met with appellant twice in the jail, but only one of those meetings included the interpreter. His visits lasted between an hour and one and one-half hours each. According to counsel, appellant never conveyed to him that he was afraid for his life on the night of the offense. During their first meeting, appellant also neglected to mention his claim that Phi was carrying a gun. Counsel stated that he was surprised when appellant subsequently made this assertion. No weapon was ever found on Phi's person, and when counsel asked why appellant had not mentioned this claim earlier, appellant responded, "Well, I forgot." Appellant also relayed some other information that Phi may have harmed a person in another state, but appellant did not provide any specific details regarding this allegation.

Counsel filed a separate pretrial motion seeking the appointment of an investigator, which the trial court also granted. Although the investigator did not speak Vietnamese, counsel was confident in his ability because the investigator was a former homicide detective with whom counsel had worked in the past. Counsel also indicated that he was unaware of any Vietnamese investigators available, given the scarcity of English-speaking investigators willing to work on court-appointed cases.

The investigator contacted several of the State's witnesses. He spoke with the owner of the karaoke bar, as well as her brother, who was drinking with appellant and Phi on the night of the offense. Both witnesses are Vietnamese speakers who happen to have a very good command of the English language. The investigator made efforts to interview other witnesses, including the bar owner's husband, another witness who was homeless, and the

two waitresses whom appellant had encountered later that night. Counsel stated that the investigator was unable to contact these witnesses, not because of a language barrier, but because the witnesses never responded to the investigator's inquiry. Counsel emphasized that if contact had been made and there were still difficulties in communication, additional measures would have been taken to facilitate the interview.

On one occasion, the investigator went to the jail for a meeting with appellant. The interpreter did not attend this meeting, but appellant was able to provide the investigator with information that was later included in the investigator's report. Counsel stated that the investigator conducted a background check on Phi, but he discovered only a conviction for DWI. There was no mention of a conviction for harming somebody in another state.

Counsel asked the investigator to determine if appellant had any witnesses who could testify on appellant's behalf. Appellant never provided him with any names. Counsel also asked appellant personally if appellant wanted his parents or family to testify. Appellant answered, "I don't think they can help. I don't want you to get them involved. I don't want to go down that road, basically."

Counsel successfully filed a *Theus* motion, which allowed appellant to testify without being impeached with evidence of his prior conviction for aggravated assault. *See Theus v. State*, 845 S.W.2d 874 (Tex. Crim. App. 1992). Counsel stated that if appellant had called his relatives to testify about his non-assaultive character, their testimony would have opened the door to this extraneous offense.

### 2.    The Interpreter

The interpreter present during appellant's jury trial identified several witnesses who had testified in Vietnamese. Some of these witnesses were capable of speaking English, but for the purposes of trial, they felt more comfortable testifying in Vietnamese with an English translator.

6

There were some moments during the trial when appellant disagreed with a witness's testimony. When these moments occurred, the interpreter conveyed appellant's disagreements to appellant's trial counsel. The interpreter clarified that appellant never expressed any confusion about the proceeding itself.

On the second or third day of trial, appellant told the interpreter about a man named Hieu Nguyen whom appellant had met in jail. Appellant claimed that Hieu was in the karaoke bar on the night of Phi's murder. The interpreter related this new information to appellant's trial counsel. The interpreter also denied an allegation that appellant had given him a piece of paper containing Hieu's name and prison identification number.

The interpreter finally testified that he remembered hearing counsel ask appellant at the conclusion of the guilt-innocence phase of trial if appellant knew of any witnesses who should be called on his behalf. Appellant's answer was, "No, I don't have anyone."

### 3.    Witnesses Not Called

Hieu Nguyen testified that he had been friends with Phi for seven or eight years. According to Hieu, Phi used cocaine, and he could become hostile if he needed drugs but could not obtain them. Phi also had a bad reputation for being assaultive and for causing physical altercations with others.

Hieu said that he met appellant in a holdover cell behind the courtroom at a time when both men were awaiting separate trials. While in that cell, appellant mentioned to Hieu that he had stabbed Phi because he believed Phi had a gun. Hieu responded that when he was at the karaoke bar, he saw what appeared to be a gun in the back of Phi's pants. Hieu believed he had seen a gun because he had given Phi weapons to keep in the past. This explanation contradicted an earlier statement from Hieu, in which Hieu asserted that he had never seen Phi with a gun before that night.

Hieu testified that he gave his name and prison identification number to appellant. He denied ever meeting with appellant's attorney.

7

Appellant called other character witnesses during the hearing. Appellant's brother and boss testified that appellant was truthful, gentle, and non-assaultive. Similar testimony was offered from appellant's adopted father, who further testified that appellant was a friendly man. Appellant's father stated that he was not contacted by either counsel or the investigator in regards to testifying about this case. Although appellant wrote his father many times from jail, appellant never asked him to come to court.

### 4. Appellant

Appellant also testified at the hearing on the motion for new trial. At one point, his appellate attorney instructed the court's interpreter not to assist in translation. Without the benefit of the interpreter, appellant claimed not to understand the initial questions that were posed to him. In subsequent questioning, however, appellant responded in English, and even mentioned that he was able to speak to his trial counsel in English. Appellant testified without translation that he had asked his trial counsel for an interpreter because he did not speak English very well. Appellant also complained that an interpreter was not present during four of his court settings.

With the court interpreter back in use, appellant described additional struggles in communication. He complained, for instance, that the interpreter who assisted counsel in jail spoke in a regional dialect of Vietnamese different from his own. Appellant also testified that counsel had asked him about bringing witnesses to testify in court, but that no one had explained the importance of witnesses. Appellant stated that had he known how important witnesses could be, he would have asked his relatives to testify.

### 5. The Prosecutor

The prosecutor testified that she was familiar with the names of the individuals discussed at the hearing, including those who did not testify at trial. According to the prosecutor, all of the known fact witnesses testified at trial, and many of the other witnesses discussed at the hearing were not eligible to testify because they could provide only

hearsay evidence. The prosecutor further indicated that of those witnesses who did testify, many spoke an appreciable amount of English. The inability to speak Vietnamese did not interfere with the pretrial investigation.

The trial court denied appellant's motion for new trial. Based on the observations from trial and the evidence produced during the hearing, the court determined that counsel's performance was competent, thorough, vigorous, and diligent. The court took notice that appellant had a "workable understanding . . . of the English language" and that he had "demonstrated a communication skill level in English." The court also found credible the testimony that appellant had told his attorney that he did not want his parents involved in the case. Furthermore, the court found that a piece of paper containing Hieu's name and prison identification number was never passed to counsel.

## ISSUES PRESENTED

Appellant's case has not been briefed very clearly. In his first issue, appellant argues that counsel was ineffective because he failed to conduct a complete and independent investigation of the case. Also within this first issue, appellant complains that counsel failed to object to the prosecutor's improper closing statement. In his second issue, appellant argues that he was denied due process under the law because he was unable to communicate with counsel. In his third issue, appellant argues that the trial court erred by denying his motion for new trial, a complaint that essentially recasts his first two issues in another form. We begin with appellant's second issue, which addresses a concern central to this entire appeal.

## ANALYSIS

### A.   Appellant was not denied an interpreter.

Appellant contends that he was denied due process because he was unable to communicate effectively with counsel and his investigator. In his brief, appellant insists that there were "serious communication issues" when counsel first met with him, more

9

than a year before the start of trial. An interpreter did not accompany counsel for this initial meeting, and because of their apparent language barrier, appellant claims that the details of his self-defense were developed in "piecemeal" fashion.

It is difficult to perceive how appellant was prejudiced by the absence of an interpreter during this first meeting with counsel. When counsel realized that appellant did not have a complete grasp of the English language, he moved for the appointment of an interpreter. The trial court granted the appointment, and an interpreter accompanied counsel in his second visit to the jail. It is clear from the record that counsel was able to present a claim of self-defense to the jury. Appellant has not argued or shown how his defense would have been more successful but for the absence of an interpreter in the earliest stages of counsel's representation.

Appellant argues next that he was unable to communicate effectively with the investigator. His complaint focuses, in part, on the investigator's failure to ask appellant about his defense. We fail to see how appellant was prejudiced by this omission. Appellant testified that he told the investigator about his accidental stabbing of Phi, and at some point during the representation, appellant was able to apprise counsel of the same defense through the use of an interpreter.

Appellant also complains about an instance when the investigator discussed some papers from the district attorney's office. During his hearing on the motion for new trial, appellant testified that he recalled the investigator mentioning the case number and the complainant's name. Appellant claims he did not understand anything more from their meeting, and in his briefing, he writes, "It would appear that the Appellant failed to grasp any more from the contents of the papers read to him." Again, appellant has provided no argument or authority that he was prejudiced by this claimed moment of incomprehension. Moreover, because the objectionable papers were never admitted into evidence and because no further testimony was elicited on this subject, we have no means of assessing the value of the papers' contents.

10

Appellant finally complains that an interpreter was absent during some of his pretrial court settings. Appellant does not identify any of these settings by date. From the trial court's docket sheet, we can determine that eight settings were conducted between counsel's appointment in November 2009 and counsel's motion for the appointment of an interpreter in November 2010. Appellant argues that although he was present for these settings, "[p]resence requires not only physical attendance, but comprehension of the proceedings." *See Garcia v. State*, 149 S.W.3d 135, 141 (Tex. Crim. App. 2004) (discussing how the right to confrontation requires some appreciable understanding of the proceedings). Appellant's complaint seems to be that, without the benefit of an interpreter, his right to be present in court was violated because he had no means of understanding these pretrial settings.

Assuming for the sake of argument that appellant was entitled to an interpreter at the pretrial settings, appellant has not shown that he suffered any harm from the interpreter's absence. *See Sanchez v. State*, 122 S.W.3d 347, 352 (Tex. App.—Texarkana 2003, pet. ref'd) (noting that a violation of the right to be present is reviewed for harmless error). Because no transcript was prepared during any of the pretrial settings, we are unable to determine if the settings were adversarial in nature. Moreover, appellant has not argued, and there is no indication from the record, that the settings ended with a written order being entered, that they included evidence or argument, or that they resulted in a conclusion by the trial court. *See id.* (describing situations in which a defendant's right to be present would be implicated).

Appellant was found to possess a "workable understanding" of the English language. An interpreter was still provided to aid in any struggles he may have had with trial counsel. The trial court ensured that an interpreter was present throughout the entire trial on the merits. We cannot say that appellant was denied the due process of law simply because an interpreter was absent on some occasions before the trial commenced. *See Linton v. State*, 275 S.W.3d 493, 500 (Tex. Crim. App. 2009) (when the adequacy of

11

interpretive services is challenged on appeal, the question is not whether the "best" services were employed, but whether the services that were actually employed were constitutionally adequate such that the defendant could understand and participate in the proceedings).

**B.    Appellant was not denied the effective assistance of counsel.**

In his remaining issues, appellant contends that trial counsel was ineffective because he failed to conduct a complete investigation of the facts and he failed to object to improper jury argument. We examine these claims under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).

Under *Strickland*, appellant must prove that his trial counsel's representation was deficient, and that the deficient performance was so serious that it deprived him of a fair trial. *Id.* at 687. Counsel's representation is deficient if it falls below an objective standard of reasonableness. *Id.* at 688. This deficiency will deprive appellant of a fair trial only when counsel's performance prejudices appellant's defense. *Id.* at 691–92. To demonstrate prejudice, appellant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694. Failure to make the required showing of either deficient performance or sufficient prejudice defeats the claim of ineffectiveness. *Id.* at 697. This test is applied to claims arising under both the United States and Texas Constitutions. *See Hernandez v. State*, 726 S.W.2d 53, 56–57 (Tex. Crim. App. 1986).

As a reviewing court, we look to the totality of the representation and to the circumstances of the case, not to isolated instances in the record reflecting errors of omission or commission. *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006). Moreover, we consider the adequacy of assistance as viewed at the time of trial, rather than through hindsight. *Id.* at 482. Our review of defense counsel's performance is highly deferential, beginning with the strong presumption that the attorney's actions were reasonably professional and were motivated by sound trial strategy. *Jackson v. State*, 877

12

S.W.2d 768, 771 (Tex. Crim. App. 1994). Accordingly, we do not speculate as to the reasons supporting counsel's behavior. *Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002). Any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). When the record is silent as to trial counsel's strategy, we will not conclude that appellant received ineffective assistance unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005).

### 1. Investigation of the Case

Defense attorneys have a duty to make an independent investigation of the facts of a case, including seeking out and interviewing potential witnesses. *See Perez v. State*, 310 S.W.3d 890, 894 (Tex. Crim. App. 2010); *Ex parte Welborn*, 785 S.W.2d 391, 393 (Tex. Crim. App. 1990). Appellant argues that counsel's performance was constitutionally deficient because counsel neglected this duty in two ways. First, counsel relied on an investigator who spoke only English, and the investigator failed to interview all of the pertinent fact witnesses. Second, counsel failed to obtain witnesses who could testify on appellant's behalf.

An attorney is not ineffective simply because he relies on a private investigator to investigate the facts of a case; indeed, it is both permissible and common for an attorney to engage an investigator to interview witnesses before trial. *See Ex parte White*, 160 S.W.3d 46, 52–53 (Tex. Crim. App. 2004); *Starz v. State*, 309 S.W.3d 110, 119 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). The private investigator in this case was able to contact some, but not all, of the State's witnesses. Appellant has suggested that the investigator's failure to interview all of the witnesses was a product of his being able to speak only in English. This position was challenged, however, at the hearing on the motion for new trial. The evidence there showed that many of the State's witnesses were able to speak English. Appellant's trial counsel also indicated that if the investigator was unable to

13

contact a potential witness, his difficulty was a product of the witness's unwillingness to get involved, rather than some pervasive language barrier.

Also, we cannot conclude that counsel was ineffective because he failed to call Hieu as a witness. Hieu's name was first mentioned during the middle of trial, and there appears to have been some dispute about the efforts taken to alert counsel of Hieu's potential testimony. Having considered the credibility of the witnesses, the trial court determined that a note was never passed to counsel with Hieu's name and prison identification number. Accordingly, there are doubts as to whether counsel was provided sufficient information to locate and interview Hieu before the end of trial.

Even if we were to assume that counsel was deficient by failing to call Hieu as a witness, appellant has not shown that he suffered any prejudice. A claim of ineffective assistance of counsel based on counsel's failure to call witnesses fails in the absence of a showing that such witnesses were available to testify and that the defendant would have benefitted from their testimony. *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983); *Wade v. State*, 164 S.W.3d 788, 796 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Appellant argues that Hieu would have corroborated his claim that Phi was carrying a gun on the night of the offense. But Hieu's testimony at the hearing on the motion for new trial was inconsistent with other testimony developed at trial. Hieu said that he witnessed Phi's gun in the back of his pants, whereas appellant claimed the gun was in the front. Hieu also testified that he left the karaoke bar just after eight o'clock, whereas the other witnesses testified that Phi did not arrive until between ten or eleven o'clock that night. Hieu also suffered from various credibility problems. He had been convicted of a number of felonies, and during the course of the same hearing, Hieu testified both that he had never seen Phi with a gun before and that he had often given Phi weapons to keep. Appellant has not shown by a preponderance of the evidence that there was a reasonable probability that the proceedings would have been different but for counsel's failure to call Hieu to the stand.

14

The same can be said of the other witnesses not called. As indicated by the prosecutor, all of the fact witnesses known to be available had testified at trial. Appellant still insists that there were other witnesses who could have testified about his character for being truthful and non-assaultive. But appellant instructed his attorney not to involve these witnesses in his case. Counsel cannot be deficient for abandoning efforts to investigate potential witnesses when the defendant tells him not to pursue a particular line of investigation. *See Ex parte Martinez*, 195 S.W.3d 713, 729 (Tex. Crim. App. 2006). Moreover, even if these character witnesses were available to testify, counsel could have decided, within reason, that they should not be called because having them testify would have opened the door to appellant's being impeached with evidence of his previous convictions.

### 2. Improper Jury Argument

Appellant also complains that counsel was ineffective because he failed to object to the prosecutor's improper closing statement. The prosecutor stated the following at the end of the punishment stage of trial:

> We heard some testimony that a community here in Houston, a community in Harris County with people who came here as immigrants who live and work together and that sometimes they don't come and talk to the police as much, but don't you know the community is in that map that's up there on the board that's admitted into evidence.
>
> And they're watching what you do and they want to know what you're going to do to protect them and their community because he's a person that committed murder in their community, and he's a person who will continue to be a threat to their community.
>
> And I want you to think about them in that community as you assess your punishment because at the end of the day, you're the 12 people that can keep them out of their neighborhood and keep them off the street and keep them safe.

15

The witnesses . . . who are so scared to come down here, they are going to watch what you do and they want to make sure they can be safe from the defendant.

We don't know a lot to tell you about Phi. He's an immigrant here just [like] a lot of people who came here as immigrants and they work and they keep their head down, they don't get in trouble. They have friends and they don't have family. But today you can speak for Phi and you will be the last people whoever—whoever think of or speak of Phi to ask justice for him.

And you can talk about parole law. There's a part that talks about the parole and you can't—you can't know. You guys can't go back there and say, well, if we give him this amount of years I bet he will serve this because we don't know what the parole board will do. That is not out purpose.

But I can tell you that every minute, every day, every month, every year, every decade that you assess punishment for him will be that same month and year and decade that that community and us as citizens of Harris County are safe from this person. And so when we ask you to sentence him to life you can be proud of your decision because you've gotten him off the streets.

Appellant argues that this argument injected new and harmful facts into the sentencing hearing. Specifically, he complains that the prosecutor made a suggestion that she had "special knowledge" of a "special community" in Houston and that appellant "is a person who will continue to be a threat to the special community."

We are not persuaded by appellant's suggestions that the prosecutor's argument was improper. Proper jury argument may consist of (1) a summation of the evidence, (2) reasonable deductions from the evidence, (3) an answer to argument of opposing counsel, and (4) a plea for law enforcement. *Allridge v. State*, 762 S.W.2d 146, 155 (Tex. Crim. App. 1988). Even aggressive argument is permissible if it falls within one of these four categories. *See Berry v. State*, 233 S.W.3d 847, 860 (Tex. Crim. App. 2007). We construe the prosecutor's argument here as a plea for law enforcement, rather than the injection of facts outside the record. *See Harris v. State*, 122 S.W.3d 871, 888 (Tex. App.—Fort Worth 2003, pet. ref'd) ("An argument constitutes a proper plea for law

16

enforcement if it urges the jury to be the voice of the community . . . ."); *e.g.*, *Goocher v. State*, 633 S.W.2d 860, 864 (Tex. Crim. App. [Panel Op.] 1982) (finding permissible argument that proceeded, "I am asking you to enforce it. I'm asking you to do what needs to be done to send these type of people a message to tell them we're not tolerating this type of behavior in our county."); *Waters v. State*, 330 S.W.3d 368, 376 (Tex. App.—Dallas 2010, pet. ref'd) ("I ask that you give him 60 years. That's my recommendation, because by doing that, you're putting him away for as long as you can, but you're not telling him he's a bad person, you're keeping our community safe, and you're sending a message with him that we will not tolerate this type of behavior, we will not tolerate this type of behavior."). Because the argument was proper, counsel cannot be ineffective for failing to object to it. *Richards v. State*, 912 S.W.2d 374, 379 (Tex. App.—Houston [14th Dist.] 1995, pet. ref'd).

Finally, we note that even if the argument were improper, appellant has not overcome the presumption that counsel's failure to object was motivated by sound trial strategy. Appellant did not complain about the prosecutor's closing statement in his motion for new trial, and the prosecutor's argument was not discussed at all during his hearing on the motion for new trial. Accordingly, the record is silent regarding counsel's reasons for not objecting. In these circumstances, we will not conclude that counsel's performance was constitutionally deficient if any strategic motivations can be imagined for the challenged conduct. *See Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001).

As we have said before, "[n]ot objecting can be a trial strategy." *Henderson v. State*, 704 S.W.2d 536, 538 (Tex. App.—Houston [14th Dist.] 1986, pet. ref'd); *see also Huerta v. State*, 359 S.W.3d 887, 894 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Counsel may have decided to withhold an objection so as to avoid emphasizing or drawing attention to the prosecutor's closing statement. *Cf. Brennan v. State*, 334 S.W.3d 64, 76–77 (Tex. App.—Dallas 2009, no pet.) (observing that counsel's failure to request relief following impermissible comment may have been motivated by recognition that "requesting further

relief would have only highlighted the prosecutor's statement"). Because a reasonable strategy can be imagined for counsel's actions, we conclude that appellant failed to carry his burden of showing that counsel was ineffective by not objecting to the prosecutor's closing statement.

## CONCLUSION

Appellant was not denied the due process of law, counsel's performance was not constitutionally deficient, and the trial court did not abuse its discretion by finding that appellant received effective assistance of counsel. Appellant's three issues are overruled and the judgment of the trial court is affirmed.


/s/     Adele Hedges
        Chief Justice


Panel consists of Chief Justice Hedges and Justices Seymore and Brown.

Do Not Publish — Tex. R. App. P. 47.2(b).